UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Vincent A. Beacom,                                    Civil No. 13-985 (DWF/FLN)

          Plaintiff,

v.                                                    **MEMORANDUM**
                                                          **OPINION AND ORDER**
Oracle America, Inc.,

          Defendant.

_____

Bonnie M. Smith, Esq., Brock J. Specht, Esq., and Steven Andrew Smith, Esq., Nichols Kaster, PLLP, counsel for Plaintiff.

Sarah E. Bouchard, Esq., and Brandon J. Brigham, Esq., Morgan Lewis & Bockius LLP; and Jessica J. Nelson, Esq., and Paul J. Zech, Esq., Felhaber Larson, counsel for Defendant.

_____

**INTRODUCTION**

This matter is before the Court on Defendant's Motion for Summary Judgment (Doc. No. 44). For the reasons set forth below, the Court grants Defendant's motion.

**BACKGROUND**

In March 2012, Plaintiff Vincent A. Beacom ("Beacom") was fired from his position as Vice President of Defendant Oracle America, Inc.'s ("Oracle") Americas Division Retail Global Business Unit. (Doc. No. 47 ("Brigham Decl.") ¶ 11, Ex. 9 ("Olson Dep.") at 12-13; Doc. No. 53 ("Beacom Decl.") ¶ 4.) Beacom had worked at Oracle since 2005, when Oracle acquired his previous employer, Retek, Inc. (Beacom

Decl. ¶ 3.)  Beacom contends that he was fired for complaining that his supervisor fraudulently inflated sales targets.  Oracle asserts that Beacom was fired because he performed poorly, undermined his boss, and disparaged both his boss and the company's president.

From the inception of his employment with Oracle, Beacom was the Vice President of the Americas division of an Oracle retail global business unit.  (Doc. No. 1 ("Compl.") ¶ 18.)  In his position, Beacom was responsible for supervising a sales force that sold Oracle software and hardware products to retail customers throughout North and South America.  (*Id.* ¶ 15.)  Beacom was responsible for setting sales targets for his sales force and also assisted the sales force in closing deals for Oracle's products.  (*Id.* ¶ 19.)  In fiscal year 2011, for example, the Americas division accounted for $65 million in revenue.  (Brigham Decl. ¶ 7, Ex. 5 ("Summit Presentation") at 5.)  Oracle's total revenue from all of its business units was $35 billion in 2011, and thus Beacom's division comprised only a fraction of a percent of Oracle's total yearly revenue.  (Brigham Decl. ¶ 3, Ex. 1 ("2012 10K Annual Report") at 37.)

During his tenure with Oracle, Beacom received consistently positive performance reviews.  Beacom's reviews noted his skill at forecasting and his ability to help his sales force sell and close deals.  (Doc. No. 54 ("Sprecht Decl.") ¶ 2, Ex. 1 ("FY 2007 Performance Review") at 119; Sprecht Decl. ¶ 2, Ex. 2 ("FY 2008 Performance Review") at 121.)  In recognition of his performance, Beacom was named to Oracle's Presidents Club for five of his six years with the company, earning all-expenses-paid trips along with other successful sales employees.  (Beacom Decl. ¶ 5.)

2

In November 2010, Beacom's boss, who had served as the General Manager of Oracle's Retail Global Business Units, resigned. (Brigham Decl. ¶ 4, Ex. 2 ("Weiler Dep.") at 4-7; Brigham Decl. ¶ 10, Ex. 8 ("November 2010 E-mail from Weiler to Angove") at 2.) Robert Weiler ("Weiler"), the new Executive Vice President of Oracle's Global Business Units, asked Beacom to serve as the interim general manager during the search for a permanent replacement. (Weiler Dep. at 3-5.) Although Beacom wanted to be hired for the permanent general manager position (Brigham Decl. ¶ 9, Ex. 7 ("Beacom Dep.") at 5), Oracle hired Michael Webster ("Webster") for the position, and Webster began working in that role in February 2011. (Weiler Dep. at 7-8; Compl. ¶ 36.) Weiler gave Beacom a stock award of 20,000 options to thank him for serving as the interim general manager. (Beacom Dep. at 7; Sprecht Decl. ¶ 2, Ex. 4 ("March 2011 E-mail from Weiler to Beacom").)

Oracle's fiscal year runs from June 1 to May 31 of each year. (Brigham Decl. ¶ 8, Ex. 6 ("Webster Dep.") at 5.) In fiscal year 2012, which ran from June 2011 to May 2012, Oracle implemented a new way to assign sales quotas to its retail business units. Before 2012, the sales quotas had essentially come from the sales force itself, with each level of management above the sales force evaluating the sales forces' estimates of the deals that would likely be closed in a given quarter and adjusting the quotas accordingly. *See In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 388 (9th Cir. 2010) (describing Oracle's "bottom-up" forecasting process). Beginning in 2012, Webster decided that upper-level management would instead assign quotas and set sales targets, using information provided by the sales force and their supervisors, such as Beacom. (Brigham Decl. ¶ 12,

3

Ex. 10 ("March 2011 E-mail from Goedert to Beacom").)  Beacom was responsible for determining how his sales force would meet the targets set by Oracle.  (Brigham Decl. ¶ 13, Ex. 11 ("August 2011 Management Meeting Notes") at 271-72.)

For the first quarter of fiscal year 2012, Oracle determined that the Americas division could produce $16.4 million in revenue.  (Brigham Decl. ¶ 14, Ex. 12 ("August 15, 2011 Weekly Operating Summary") at 455.)  Beacom asserts that this target was fraudulent because there were only $12.9 million in deals that were "forecasted" for the quarter, meaning that the deals were relatively certain to occur in that quarter.  (*See* Weiler Dep. at 38 (explaining Oracle's terminology for the certainty of its sales deals).)  According to Oracle, Beacom's sales "pipeline" had more than $110 million in deals, with $67 million of that total listed as "best case" deals, so that even under the previous quota-assignment method, a quota of $16.4 million was not unreasonable or inflated.

Despite repeated assurances from Beacom that his division would meet the target for the first quarter, the Americas division ultimately closed only $11.35 million in the first quarter of fiscal year 2012.  (Brigham Decl. ¶ 17, Ex. 15 ("August 2011 E-mail from Beacom to Goedert").)  Thus, the division missed not only what Beacom asserts is a fraudulent sales target, but also missed closing all of the deals that the sales force believed were relatively certain to close during the quarter.  Beacom described the division's failure to meet its sales quota as a "miss [that] was as bad as it gets. . . .  We embarrassed ourselves . . . ."  (Brigham Decl. ¶ 19, Ex. 17 ("Direct's Reports").)

The division similarly underperformed in the second quarter of fiscal year 2012. For that quarter, the division had $27.5 million in "forecasted" deals, and its sales quota

4

for the quarter was $27 million.  At the time, Beacom told his supervisors that the deals in the sales pipeline "more than cover our commitment" for the second quarter. (Brigham Decl. ¶ 21, Ex. 19 ("Q212 NA License Opportunities") at 531.)  Again, however, despite Beacom's assurances that the division would meet its sales target, the division's performance caused Webster to twice lower that target, eventually requiring a sales quota of only $19 million for the second quarter.

In the third quarter, Webster set the division's sales target at $25 million.  In mid-January 2012 of that quarter, both Beacom and Webster attended a National Retail Federation conference in New York City.  (Webster Dep. at 28-29.)  At the conference, Webster made light of the sales target that he had asked Beacom's division to make for the third quarter, stating in a large meeting that he would tattoo a "f-----g 30" on Beacom's forehead.  (Beacom Dep. at 39.)  Beacom later confronted Webster about the division's sales target, telling Webster that Beacom did not "see any path to get there." (*Id.*)  Beacom concedes that Webster did not increase the division's quota to $30 million, but that the quota stayed at the original $25 million target.  (*Id.*)  The division ultimately produced only $15 million in revenue in the third quarter.

Later in January 2012, Beacom complained to Jennifer Olson ("Olson"), Oracle's Senior Director of Human Resources, about the sales targets that Webster had set for Beacom's division.  (Olson Dep. at 17.)  According to Olson, Beacom sought her guidance as to how he could better work with Webster.  (*Id.* at 18.)  Beacom characterizes the conversation differently, stating that he told Olson that Webster was "sending the wrong expectation to senior management."  (Beacom Dep. at 14.)  Although

5

he did not say this to Olson, Beacom contends that he believed that the unrealistically high sales quotas "would impact the street," in reference to Wall Street. (*Id.*)

By late January 2012, Weiler had decided that Beacom should be fired. Weiler contacted Olson, who testified that Weiler was "annoyed with [Beacom's] inconsistent and lack of performance against forecasts." (Olson Dep. at 14.) Weiler told Olson that Beacom had performed poorly in a recent meeting with a customer and that Weiler "did not feel that[] Beacom was able to put together a strategic plan of action to close a deal properly." (*Id.*) Olson then contacted Webster, and together they decided that Beacom's termination should wait until the end of the third fiscal quarter to see if Beacom's performance improved. (*Id.* at 14-15.) On March 5, 2012, Webster fired Beacom, citing poor performance as the reason for his termination. (Beacom Dep. at 36.)

On April 26, 2013, Beacom commenced this lawsuit against Oracle. (Doc. No. 1 ("Compl.").) In his Complaint, Beacom asserts the following claims against Oracle: (I) Retaliation in Violation of the Sarbanes-Oxley Act of 2002; and (II) Retaliation in Violation of the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010. (*Id.* ¶¶ 104-11.) Oracle now moves for summary judgment on both claims. (Doc. No. 44.)

## DISCUSSION

### I.     Legal Standard

Summary judgment is appropriate if the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Courts must view the evidence and all reasonable inferences in the

6

light most favorable to the nonmoving party.  *Weitz Co. v. Lloyd's of London*, 574 F.3d 885, 892 (8th Cir. 2009).  However, "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to secure the just, speedy, and inexpensive determination of every action."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986).

The moving party bears the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law.  *Enter. Bank v. Magna Bank*, 92 F.3d 743, 747 (8th Cir. 1996).  The nonmoving party must demonstrate the existence of specific facts in the record that create a genuine issue for trial.  *Krenik v. Cnty. of Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995).  A party opposing a properly supported motion for summary judgment "may not rest upon the mere allegations or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).

**II.     Oracle's Motion for Summary Judgment on Counts I and II**

**A.     Count I**

Oracle first argues that it is entitled to summary judgment on Count I of Beacom's Complaint, which alleges unlawful retaliation in violation of the Sarbanes-Oxley Act of 2002 ("Sarbanes-Oxley").  Under Sarbanes-Oxley, employees are protected from retaliation for reporting conduct that the employee reasonably believed violated securities laws or regulations to their superiors or to a governmental entity.  18 U.S.C. § 1514A(a).  To establish a claim for retaliation under Sarbanes-Oxley, Beacom must establish that: (1) he engaged in protected activity within the meaning of the statute; (2) Oracle knew of

the protected activity or suspected Beacom of engaging in that activity; (3) Beacom suffered an unfavorable personnel action; and (4) his protected activity was a contributing factor in the unfavorable personnel action. *Miller v. Stifel, Nicolaus & Co.*, 812 F. Supp. 2d 975, 982 (D. Minn. 2011).

Beacom's Sarbanes-Oxley claim fails to meet the first element of this four-part analysis because Beacom cannot establish that he engaged in any activity protected by the statute. The statute provides protection for an employee who provides information that he "reasonably believes constitutes a violation of" the securities laws. 18 U.S.C. § 1514A(a)(1). Thus, only communications that are "'related[d] to one of the six enumerated categories of misconduct contained in[] § 806, i.e., mail fraud, wire fraud, bank fraud, securities fraud, violation of an SEC rule or regulation, or violation of a federal law relating to fraud against shareholders' [are] protected by" Sarbanes-Oxley's retaliation provision. *Miller*, 812 F. Supp. 2d at 987 (internal quotations omitted).

Beacom's complaints about the Americas division's sales quotas are not protected under Sarbanes-Oxley for two reasons. First, Beacom did not subjectively and could not objectively reasonably have believed that Webster's sales targets violated the federal securities laws or the SEC's rules or regulations. Second, there is no evidence that Beacom ever communicated with anyone at Oracle (or anywhere else) regarding his alleged suspicions that the sales targets might violate Oracle's obligations under the securities laws or regulations.

There is no evidence in this case that Beacom ever told anyone at Oracle that Webster's sales targets were problematic for any reason other than Beacom did not

8

believe his division could meet those targets.  Although an employee need not specify in a Sarbanes-Oxley-protected communication that he suspects securities fraud or some other specific violation of the securities laws or regulations, he must do more than Beacom did here.  At best, Beacom told Webster that Beacom could see "no path" to reach the $25 million target that Webster set for the third quarter, and he told Olson that Webster's sales quotas were setting the wrong expectation for senior management.  His communications with Webster and Olson are not sufficient to put Oracle on notice that Beacom believed Oracle was violating securities laws.

Beacom now claims that he believed that the inflated sales targets would ultimately be communicated to investors and that such communication would be illegal. Although the "reasonable belief" element of a Sarbanes-Oxley retaliation claim contains a subjective component, *see Day v. Staples, Inc.*, 555 F.3d 42, 54 (1st Cir. 2009), Beacom's insistence that he maintained this subjective belief is belied by his contemporaneous statements and actions noted above.  It is insufficient for Beacom to claim in a deposition that his complaints were motivated by his alleged belief that Webster was causing Oracle to violate the securities laws; Beacom must submit some evidence that, at the time of the complaints, he held this belief.  The only evidence in this case is to the contrary.

Even if Beacom did believe that Webster's sales targets somehow violated the securities laws, however, such a belief was not objectively reasonable as a matter of law. "The reasonableness of [the employee's] belief for purposes of § 1514A must be measured against the basic elements of the laws specified in the statute." *Day*, 555 F.3d

9

at 55. In other words, "[t]o have an objectively reasonable belief that there has been shareholder fraud, the complaining employee's theory of such fraud must at least approximate the basic elements of a claim of securities fraud." *Id.* Such elements include a material misrepresentation and a connection between that misrepresentation and either actual or potential loss. *See id.* This is not to say that Beacom must have used the word "fraud" when complaining about Webster's conduct, or even that Beacom had to know all of the elements of fraud.[1] However, if in fact the conduct of which Beacom complained did not constitute fraud, and if a reasonable person in his position would have known that the conduct was not fraudulent, then Beacom's belief that the conduct was fraudulent is not objectively reasonable as a matter of law. *See Wiest v. Lynch*, 710 F.3d 121, 132 (3d Cir. 2013); *see also Day*, 555 F.3d at 56 (finding that an employee must have "an objectively reasonable belief that the company intentionally misrepresented or omitted certain facts to investors, which were material and risked loss").

Beacom has pointed to no authority to support the proposition that a sales target that is higher than he believes it should be is fraudulent. Beacom was dissatisfied with both the Americas division's sales targets and with Webster's decision to set those targets from the top-down, but absent evidence that Webster's targets bore no relationship to reality—that they were a material misrepresentation on Webster's part that was intended

---

[1] As the parties recognize, there is a split of authority as to whether a complaining employee's communication must "definitively and specifically" relate to the statutes listed in Section 1514A(a). However, the Court's determination on this issue does not depend on the "definitive and specific" standard.

to induce shareholders to rely on it—Beacom could not reasonably have believed that those targets were in any way fraudulent.

      Beacom has come forward with no evidence that the targets set by Webster were indeed fraudulent—that the targets were so high that they would substantially affect Oracle's bottom line, for example, or even that the targets were unobtainable.[2]  Even if Beacom is correct that the targets were, as he repeatedly insists, fraudulent, there is no evidence that Beacom contemporaneously suspected that those targets would somehow affect Oracle's share price.  The only evidence is to the contrary, as even Beacom admitted that Webster's first quarter target was $3.5 million more than the deals that the members of Beacom's sales team listed as relatively certain to occur in that quarter.  And even if that increase in expectation was a misrepresentation, the communication to shareholders of a forecast for $3.5 million more than was achievable could not have affected Oracle's share price in any way, given that Oracle's total revenue for that quarter was $9.2 billion.  Beacom's contention that the decline in Oracle's share price in December 2011 is even partially attributable to the Americas division meeting its target stretches credulity.  Missing a revenue forecast by less than four hundredths of a percent of total revenue is not material and cannot constitute fraud.

      As discussed above, Beacom must establish that he engaged in a protected activity to advance his retaliation claim under Sarbanes-Oxley.  *Miller*, 812 F. Supp. 2d at 982.

---

[2]    In November 2011, Beacom sent an e-mail to his daughter, telling her that the second-quarter target was "tight, but do-able."  (Brigham Decl. ¶ 27, Ex. 25.)

11

Because Beacom cannot establish that he engaged in any activity protected by Sarbanes-Oxley, he fails to meet the first element of a retaliation claim. *See id.* Therefore, the Court grants Oracle's motion for summary judgment as to Count I.

**B.     Count II**

Oracle next contends that it is entitled to summary judgment on Count II of Beacom's Complaint, which alleges unlawful retaliation in violation of the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 ("Dodd-Frank Act"). The elements of a retaliation claim under the Dodd-Frank Act include the requirement that the employee engage in protected activity.[3] *See* 15 U.S.C. § 78u-6(h)(1)(A) (providing protection to individuals who "provid[e] information to the [SEC] . . . [or] make disclosures that are required or protected under the Sarbanes-Oxley Act of 2002" from retaliation by their employer). For the reasons discussed above with respect to Beacom's Sarbanes-Oxley claim, Beacom has failed to establish that he engaged in any protected activity. Because Beacom cannot show that he engaged in a protected activity, his retaliation claim similarly fails under the Dodd-Frank Act. Therefore, the Court grants Oracle's motion for summary judgment with respect to Count II.

---

[3]     The parties dispute whether a claim for retaliation under Dodd-Frank requires that the employee report the alleged illegal activity to the SEC. The Eighth Circuit recently declined to consider an interlocutory appeal that presented this legal issue. *Bussing v. COR Clearing, LLC*, No. 14-8015 (Judgment entered Sept. 4, 2014). Thus, it remains an open question, albeit one that need not be resolved to determine the merits of Beacom's Dodd-Frank claim here.

# ORDER

Based upon the foregoing, and the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1. Defendant's Motion for Summary Judgment (Doc. No. [44]) is **GRANTED**.

2. Defendant is entitled to judgment with respect to both counts of Plaintiff's Complaint (Doc. No. [1]).

3. Plaintiff's Complaint (Doc. No. [1]) is **DISMISSED WITH PREJUDICE**.

**LET JUDGMENT BE ENTERED ACCORDINGLY**.

Dated:  March 11, 2015                    s/Donovan W. Frank
                                          DONOVAN W. FRANK
                                          United States District Judge